Eastern District of Kentucky
**F I L E D**
NOV 2 7 2013
AT COVINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

| | | |
|---|---|---|
| **WEBSTER & ASSOCIATES, INC.,** | : | Action No.: 12-206-WOB-JGW |
| Plaintiff, | : | (Judge William O. Bertelsman) |
| v. | : | **OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT, EAGLEBURGMANN KE, INC.'S, MOTION FOR SUMMARY JUDGMENT** |
| **EAGLEBURGMANN KE, INC.,** | : | |
| Defendants. | : | |

This matter is before the Court on Defendant, EagleBurgmann KE, Inc.'s ("Burgmann"), Motion for Summary Judgment, filed on August 30, 2013, on the singular cause of action in Plaintiff, Webster & Associates, Inc.'s ("Webster"), Complaint (the "Webster Contract Claim") and Burgmann's breach of contract counterclaim against Webster (the "Burgmann Contract Claim"). Upon reviewing the Motion, the memoranda filed in support of and opposition to the Motion, the evidence in the record and the arguments of counsel, and for the following reasons, the Court finds that there is no genuine issue of material fact, and Burgmann is entitled to partial summary judgment on the Burgmann Contract Claim but the Motion is denied as to the Webster Contract Claim.

## I. Procedure

Webster filed its initial Complaint and lawsuit against Burgmann on October 9, 2012. *See* Doc. 1. Webster amended the Complaint on October 25, 2012 (the "Amended Complaint"). Doc. 8. In the Amended Complaint, Webster asserted one cause of action against Burgmann— the Webster Contract Claim. *Id.* Webster sought an unknown amount of damages that it believed to exceed $100,000.00. *Id.* at ¶ 13.

Burgmann responded to the Amended Complaint with an Answer denying that it had breached the Contract, and asserted a counterclaim (the "Counterclaim"). Doc. 13. In the Counterclaim, Burgmann set forth, among other things, the Burgmann Contract Claim. *Id.* The parties exchanged written discovery and Burgmann deposed Webster's corporate representative, Mr. Richard A. Webster ("Mr. Webster"), on July 23, 2013. *See* Doc. 27. Discovery closed (*see* Doc. 23) and Burgmann sought summary judgment in its favor on the Webster Contract Claim and partial summary judgment on the Burgmann Contract Claim. The parties argued Burgmann's Motion for Summary Judgment on November 15, 2013, before the Court. Doc. 40.

## II. Relevant Background and Facts

Burgmann's United States headquarters is located in Hebron, Kentucky. Doc. 31 (Affidavit of Michael Green; "Green Dec."), ¶ 2. Burgmann, among other things, manufactures fabric expansion joints and rubber expansion joints (collectively, the "Equipment") for power plants, petroleum based chemical producers, refineries, auxiliary equipment manufacturers, engineering and construction firms, food companies, pulp and paper businesses, and cement makers (the "Market"). *Id.* Burgmann also repairs and replaces the Equipment (the "Services"). *Id.*

Webster is a "one-man operation" from Atlanta, incorporated in Georgia, and conducted by Mr. Webster. *See* Doc. 32 (Deposition of Mr. Webster; "Webster Dep."), pp. 15-18. Mr. Webster is Webster's sole owner and employee. *Id.*

Webster was founded in 1984 and has been representing various product manufacturers as an independent contractor/sales representative in the Market since then. Webster Dep., pp. 19-20. Mr. Michael Green, Burgmann's General Manager, and Mr. Webster met in Atlanta in 2006 to discuss a potential relationship between Burgmann and Webster. *Id.*, p. 41. Those

discussions culminated in an agreement between the parties executed in 2007, which was later replaced by a Sales Representative's Agreement entered into on November 1, 2009 (the "Contract"). *See id.*, pp. 42, 99-100, Exs. F and C; *see also* Green Dec., ¶ 3 and Ex. 1.

### A. The Contract

Under the Contract, Webster was granted the exclusive obligation and right to solicit for the sale of Equipment to the Market in Alabama, Georgia, and Tennessee, for all Southern Company locations, for Advatech/URS in Baton Rouge and New Orleans, and all TVA locations except Plant Marshall (collectively, the "Territory"). Webster Dep., Ex. C, Appx. II.

Webster was to provide a variety of services to Burgmann in accordance with the Contract. Among other things, Webster agreed:

- To solicit and secure orders for the Equipment and maintain contracts on behalf of Burgmann with potential customers in the Territory (Contract, Section 4. A);

- To use its best efforts to obtain orders or contracts in accordance with Burgmann's practices (4. H);

- To cooperate in furnishing information for market surveys, forecasts and competitive activity in the Territory when requested by Burgmann (8 C);

- To furnish promptly information requested by Burgmann (10. A); and

- To canvass diligently and use its best efforts to sell the Equipment and Services in the Territory (10.A).

In exchange for its services, Webster received commissions as determined by Appendix I to the Contract. *Id.*, Ex. C at Appx. I.

The Contract, at Section 10. I), also states that Webster may receive commissions in accordance with the Contract for any orders accepted by Burgmann for the remaining period of the Contract, in the event that Burgmann ever terminates the Contract.

### B. Webster's Breaches of the Contract and Burgmann's Attempts to Locate Webster

All ran well between the parties until the Spring of 2011. Commencing in April 2011, Webster "went dark" on Burgmann, Burgmann's customers, and potential customers. *See* Webster Dep., pp. 70-71; *see also* Green Dec., ¶ 5. Among other things, Webster failed to contact Burgmann from April 2011 through October 2011. *Id.* When deposed, Mr. Webster could not recall the date of Webster's last contact with Burgmann. *Id.*, p. 60. And Webster failed to contact Burgmann, all while knowing precisely how to contact Burgmann by phone, e-mail, or physically at Burgmann's business address in Hebron, Kentucky. *Id.*, p. 56.

Webster made the unilateral decision to take the entire month of July 2011 "off" and failed to inform Burgmann or any customers of its time off from work. Webster Dep., pp. 60-62. In June, July, and August 2011, Webster failed to check or respond to e-mail communications; yet, e-mailing was a common form of contact between the parties. *See id.* at p. 62; Green Dec., ¶ 6. Specifically, on June 15, 2011, Webster received an e-mail from Mr. Green, requesting Webster's plan and assistance with "growing the business in the market segments we intend to dominate." Webster Dep., pp. 127-128, Ex. I. Webster received this communication but failed to respond to it. *Id.*

Webster received another e-mail from Mr. Green the following day, June 16, 2011, asking Webster to call Mr. Green to share Webster's "plan to dominate the Coal Plant Expansion Joint market in [the Territory]." Webster Dep., pp. 129-130, Ex. J. Webster received that communication but failed to respond to it. *Id.*

4

A short time later, on June 28, 2011, Webster received a third e-mail from Mr. Green, identifying a list of prospective customers, and requesting Webster to call each potential customer to determine whether it was a prospect or not. Webster Dep., Ex. K. Mr. Green also requested Webster to report to him after calling the prospects. *Id.* Webster did not call on these customers nor did he respond to the email. Webster Dep., pp. 129-130.

On July 21, 2011, Mr. Green sent Webster passes to a significant trade show and instructed Webster to print the passes, place Burgmann's name and booth number on them, and hand them out to customers. Webster Dep., pp. 130-32, Ex. L. Webster failed to check its e-mail in July 2011 and did not receive or respond to this communication. *Id.*

Webster claims to have located one potential new sale under the Contract in the Spring of 2011, but Webster never told Burgmann about it. *Id.*, pp. 69-70.[1] Webster's last date of known contact with any customer for which Webster received a commission was in April 2011. *Compare* Webster Dep., pp. 152-157 with Green Dec., ¶ 7.

### C. <u>Burgmann Terminates the Contract and Replaces Webster</u>

During the timeframe surrounding Webster's breaches, Burgmann made consistent attempts to contact Webster and Mr. Webster during Webster's "dark period" of incommunicado. Green Dec., ¶ 8. Burgmann commenced its attempts to contact Webster and Mr. Webster in July 2011, which included phone calls, registered mailings, and e-mails to Webster. *Id.* Burgmann even requested its representative to dispatch the local authorities to Webster's business location and Mr. Webster's home. *Id.* Webster could not be found. *Id.*

---

[1] At deposition, Mr. Webster attempted to vaguely recall some casual attempts to sell the Equipment or Service in Spring/early Summer 2011, but it could not say when it precisely may have done so, it did not tell Burgmann about these potential sales, and it has no documents to identify the potential customers. Webster Dep., pp. 62-68, 84-85, and 102-103, 111. Webster also claims to have been working on a marketing plan in June 2011, but like the aforementioned unreported sales attempts, Webster never told Burgmann about the marketing plan and has no documents to support its existence. *Id.* Notably, during the same time (June 2011), Burgmann had specifically requested marketing help from Webster but Webster failed to respond. *See* Webster Dep., pp. 127-132, Exs. I thorugh L.

5

During this time, in addition to a complete lack of communication between Webster and Burgmann, and Webster and Burgmann's customers and potential customers, Webster was not cashing its commission checks. *Id.* Burgmann reasonably concluded that Webster was gone for good and had abandoned the Contract. *See id.*

Burgmann terminated the Agreement by written letter on September 14, 2011 (the "Termination Letter") and began searching for Webster's replacement. Green Dec., ¶ 8, Ex. 2; Webster Dep., Ex. D. At deposition, Webster conceded that he had no evidence that he had contacted Burgman for 90 days or that he had solicited or secured an order or contract for 90 days. Webster Dep., pp. 118-119.

Burgmann found, trained, hired, and paid an individual to permanently replace Webster and to perform Webster's duties under the Contract to service customers and potential customers in the Market and Territory. Green Dec., ¶ 9. Burgmann has paid the replacement to perform duties that Webster should have been performing under the Contract. *Id.*

### D. Burgmann's Payments to Webster

Burgmann paid Webster all that Webster was owed through the date of termination of the Contract. Webster Dep., pp. 80-81. Throughout the life of the Contract, Burgmann paid Webster $282,974.21, which covers Webster's commissions for every paid order for the Equipment or Services in the Market and Territory through the Contract termination date of September 14, 2011. Green Dec., ¶ 11.

### III. Legal Conclusions

### A. Summary Judgment Standard

"Summary judgment is proper where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law." *Bridgeport Music, Inc.*

6

*v. Dimension Films,* 410 F.3d 792, 797 (6th Cir. 2005) (*citing* Fed. R. Civ. 56(c)). The moving party bears the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). This burden is met by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325. A fact is material if its resolution will affect the outcome of the lawsuit. *Waters v. City of Morristown,* 242 F.3d 353, 358 (6th Cir. 2001); *see Pharakhone v. Nissan N. Am., Inc.,* 324 F.3d 405, 407 (6th Cir. 2003) ("If, under the governing law, the outcome would be the same regardless of how a factual dispute is resolved, the dispute is no bar to summary judgment."). Once the moving party satisfies its burden, the burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

When determining the merits of a summary judgment motion, "the evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmoving party." *Landham v. Lewis Galoob Toys, Inc.,* 227 F.3d 619, 622 (6th Cir. 2000); *see 2000, Multimedia, Inc. v. Attard,* 374 F.3d 377, 380 (6th Cir. 2004). The Court must not weigh the evidence, but must decide whether there are genuine issues for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. Although the disputed issue need not be "resolved conclusively in favor of the non-moving party," [the nonmoving

party] "must present significant probative evidence that makes it necessary to resolve the parties' different versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987) (citation omitted).

In this matter, Burgmann is entitled to partial summary judgment on the Burgmann Contract Claim but Burgmann's Motion for Summary Judgment is denied as to the Webster Contract Claim. There is no genuine dispute concerning Webster's breach of the Contract by failing to perform a number of duties thereunder in the Spring and Summer of 2011. Webster's breach permitted Burgmann to replace it and to receive damages in the form of all payments and other modes of compensation tendered to the replacement through the remaining period of the Contract. The Contract at Section 10.I), however, states that Webster may receive commissions in accordance with the Contract for any orders accepted by Burgmann for the remaining period of the Contract, in the event that Burgmann terminates the Contract. As such, Burgmann's Motion for Summary Judgment is denied as to the Webster Contract Claim but granted as to the Burgmann Contract Claim.

The parties' respective damages shall be briefed pursuant to further order of this Court. The parties' established damages will serve to offset each other's damages and any final award and judgment granted to either party in this case.

**B.** **Burgmann Entitled To Partial Summary Judgment on the Burgmann Contract Claim.**

The elements of a breach of contract claim in Kentucky are:

1. That the parties made a valid contract;

2. That the contract was breached;

3. That the claimant performed under the contract; and

4. That the claimant suffered damages as a result of the breach.

8

*See* Ky. Prac. Elements of an Action § 4A:1.

In this matter, Webster breached the Contract in a variety of ways when it "went dark" on Burgmann, Burgmann's customers, and potential customers beginning in the Spring of 2011:

- Webster knew how to call, e-mail, or physically mail information to Burgmann but failed to contact Burgmann from roughly April 2011 through October 2011 (Webster Dep., pp. 56, 70-71; Green Dec., ¶¶ 5-6);

- Webster ceased contacting or meeting with any of Burgmann's existing customers in April 2011 (Webster Dep., p. 70);

- Webster located a potential new sale for Burgmann in the Spring of 2011 but failed to alert Burgmann to the potential new sale or customer (Webster Dep., pp. 69-70);

- Without informing Burgmann, Webster took the entire month of July 2011 "off" from its Contract duties (Webster Dep., pp. 60-62);

- Despite it being a commonly-used form of communication between the parties, Webster admittedly failed to respond to e-mail communications from Burgmann in June and July 2011 (Webster Dep. at p. 62; Green Dec., ¶ 6);

- On June 15, 2011, Webster received but never responded to an e-mail from Burgmann, requesting Webster's plan and assistance with "growing the business in the market segments we intend to dominate" (Webster Dep., pp. 127-128, Ex. I);

- On June 16, 2011, Webster received but never responded to an e-mail from Burgmann, asking Webster to call Mr. Green to share Webster's "plan to dominate the Coal Plant Expansion Joint market in [the Territory]" (Webster Dep., pp. 129-130, Ex. J);

- On June 28, 2011, Webster received an e-mail from Burgmann, identifying a list of prospective customers, and requesting Webster to call each potential customer to

9

determine whether they were a prospect or not. Webster Dep., pp. 129-130, Ex. K. Burgmann requested Webster to report back to it after calling each prospect. *Id.* Webster neither called the prospects nor reported back to Burgmann, as requested (*Id.*); and

- On July 21, 2011, Burgmann sent Webster passes to a significant trade show and instructed Webster to print the passes, place Burgmann's name and booth number on them, and hand the passes out to customers. *Id.* at pp. 130-132, Ex. L. As a result of its failure to check e-mail in July 2011, Webster never received or responded to this communication from Burgmann so the marketing effort resultantly failed *(Id.).*

This undisputable list of conduct amounts to breaches of the Contract as follows:

- Webster failed to solicit and secure orders for the Equipment and maintain contracts on behalf of Burgmann with potential customers in the Territory (Contract, Section 4. A);

- Webster failed to use its best efforts to obtain orders or contracts in accordance with Burgmann's practices (4. H);

- Webster failed to cooperate in furnishing information for market surveys, forecasts and competitive activity in the Territory as requested by Burgmann (8. C);

- Webster failed to furnish promptly information requested by Burgmann (10. A); and

- Webster failed to canvass diligently and use best efforts to sell the Equipment and Services in the Territory (10.A).

Webster further admitted that it had failed to contact Burgman for 90 days and had not solicited or secured an order or contract for 90 days before the Contract's termination date of September 14, 2011—*i.e.,* Webster does not refute the primary factual basis for its Contract breaches and the Termination Letter. *See* Webster Dep., pp. 118-119.

Webster's breaches entitle Burgmann to judgment as a matter of law on the issue of Webster's liability for the Burgmann Contract Claim. Burgmann shall be afforded the right to establish its damages, past and ongoing, related to Webster's breach pursuant to further order of this Court.

### C. Burgmann's Motion for Summary Judgment is Denied As to the Webster Contract Claim.

Section 10.I) of the Contract states that, in the event of a termination of the Contract, Webster "will receive commissions for any orders accepted by [Burgmann,] for the remaining period of the contract." *See* Doc. 32-3. Here, due to Webster's breach, Burgmann terminated the Contract on September 14, 2011.

Section 11 of the Agreement, entitled "Duration of the Agreement," provides:

> This Agreement shall be a three (3) year "evergreen" contract, meaning the Agreement shall automatically be extended by one (1) year at the end of each contract year, unless either party shall have given written notice of its intention not to renew the Agreement at least sixty (60) days prior to the expiration of the then current year of the agreement
>
> Should the PRINCIPAL serve notice of intention to terminate the agreement, REPRESENTATIVE may be required to service ACCOUNTS in the Territory for the remaining two years of this agreement, at the PRINCIPAL's option. PRINCIPAL's decision to relieve the REPRESENTATIVE of this responsibility does not affect payment of commissions for any shipments that occur during the remaining two years of the agreement.
>
> Upon a breach of any of the terms and conditions of this Agreement, or any act of misfeasance by either party, or should either party become involved in insolvency proceedings, receivership or bankruptcy, this Agreement may be terminated immediately at the option of the other party by written notice.

*Id.*

Accordingly, since the Contract was entered into on November 1, 2009, the Contract initially ran until November 1, 2012. However, due to the "evergreen" provision, once the

11

parties reached the end of the first contract year – November 1, 2010 – the Contract extended until November 1, 2013.

The fact that Burgmann failed to provide notice of termination sixty (60) days prior to the expiration of the then current year of the agreement is irrelevant because the Contract provides that Burgmann may terminate the contract immediately due to Webster's breach. Nonetheless, the Contract provides that Webster shall be compensated for commissions on any orders accepted by Burgmann for the remaining period of the Contract. Since, at the time of Webster's termination, the remaining period of the Contract ran until November 1, 2013, Webster is entitled to receive commissions under the Contract up to and including November 1, 2013.

Burgmann and Webster shall be permitted to tender evidence and briefs concerning the value of Webster's commissions owed under the Contract, pursuant to further order of this Court.

**IT IS THEREFORE ORDERED** that Burgmann's Motion for Summary Judgment is hereby **Granted** as to the Burgmann Contract Claim but **Denied** as to the Webster Contract Claim. The parties shall brief the issue of their respective damages pursuant to further order of the Court.

_William O. Bertelsman_
Judge William O. Bertelsman

This 27th day of November, 2013.